9-6 United States versus Bill W. Womack. Good morning. Your Honor, the issue in this case is whether the search of the defendant's residence in an outbuilding next to the residence pursuant to a search warrant should be suppressed for two reasons. First reason, that the affidavit procured in support of the search warrant. Could you raise your voice a bit, please? Yes. That the affidavit procured in support of the search warrant contained misrepresentations that were material and were either false or made in reckless disregard for the truth. And second, if those sections that are contended to be false are excised, whether the affidavit otherwise supplies probable cause, if you look at the non-objectionable provisions. The specific portion of the affidavit that I want to go to is we had a situation where a vehicle had been vandalized and the affidavit was submitted by an ATF agent and the agent began the affidavit by reciting that ATF agents had responded to what was later determined to be an explosives incident. So is the portions that are incorrect or false, paragraph three where it says, I know that, and then it says what was later to be determined to be explosives, and then paragraph four where it says, I know the explosion occurred. Are there any other portions that are mistaken or false, however you would like to characterize that? That, and you may be including the introductory sentence which says at the top of the affidavit that the agents responded to what was later determined to be an explosives incident. That's at the very beginning, Judge, of the search warrant affidavit. I don't see that in attachment C affidavit. I just see paragraph three where it says they responded. That's in paragraph three of the affidavit as far as I can tell, unless we're looking at two different documents. But those are the two statements, right? That there was an explosion and that it was later determined to be an explosion. Those are the two. Those are the false or mistaken or however you want to characterize them statements, right? That's correct. Okay. That's correct. And in part because this particular agent who communicated that information in the search warrant affidavit, he was not at the scene. He was in Shreveport typing the affidavit with an assistant U.S. attorney. That's fine. But he communicated to an agent at the scene, need more PC, which he later acknowledged meant probable cause, on the explosion. He communicated with an agent who was near the scene but actually not at the scene of the bomb investigation at the vehicle. He never received a response to that. He never received any additional information indicating that they had determined that an explosion had occurred. And, in fact, the genesis of our whole motion to suppress really started at the detention hearing, which, of course, was some time after these incidents, where Agent Taylor of the ATF admitted that, one, there had been no determination by the ATF that an explosive incident occurred and that she could not even say that there was an explosion. And the reason I want to emphasize that, and I have a lot of respect for government's counsel, but I think when they portray the situation as one where everybody knew something had blown up, they just didn't know the cause, the record doesn't support that. They never got to a cause. I hope anyone can see that there was a reason to suspect that an explosion had occurred. That is why the ATF was called in. You had a Yukon with the back windshield, to use the magistrate judge's terminology, knocked out. You had a bent frame on that back window. You had small animal parts. It's kind of weird that this is what we have, scattered about the interior of the vehicle. But, on the other hand, no one heard anything. This was right next to a residence. Nobody heard anything blow up. In addition to that, there's no other damage to the interior of the vehicle. There's no fuses or detonation or any of those types of things that would be an explosion. So somebody might have actually just spread animal parts in this car. That's correct. Is that possible? We don't know. We don't know. Okay. Also, one of the statements you may be talking about, your esteemed colleague earlier having made, I thought the government's position in the brief is it was staged to reasonable interpretation after all the investigation that this scene apparently was staged to look like an explosion. Do you accept that that's a reasonable way to look at the facts? That's based primarily on the fact that the windows were spray painted black as if to look like smoke. I'll concede that the windows were painted. I don't think that that provides any basis of support for the agent's representation to the magistrate judge. Understood. Understood. But it seems to me that what Boddy said at the suppression hearing as to what he meant by it being later determined, you start with the scene that looked very much like an explosion. That's why ATF was called in. When Boddy was working on this in Shreveport, however far away that was, he was trying to get the advertisement done in a timely fashion because of the concern about what else may happen. And he says what he meant by it was later determined, he meant later when Louisiana State Police, if I understood what Boddy said in the testimony, that later Louisiana State Police later determined this must be an explosion and called in ATF. Is that a fair reading of his statement or how do you read Boddy's representation of why the affidavit said what it did? I find inconsistency in the explanation and I'm glad you referenced that argument because the district court did as well and I would like to. His testimony was that the state police went to the scene and I think the FBI was also contacted, but ultimately ATF was asked to come determine what happened. There's nothing in the record other than Boddy's statement, which I suggest was after the fact, indicating that the state police ever made any kind of determination. The reason they call the ATF is they don't make those determinations. They rely on the ATF as the entity that has expertise to do that. The word later, as used in the affidavit, also just doesn't fit those facts. He's saying to the magistrate, I think any reasonable magistrate judge reading that sentence would conclude that the ATF determined that it was an explosive incident. In fact, in the court below, and we had an evidentiary hearing before the magistrate judge, the government didn't argue then that the agent was relying on an earlier state police investigation. That wasn't argued in brief. That wasn't taken up by the magistrate judge in his reporting recommendation. He basically said he found it very troubling that the agent did not contact the agents on the ground who were doing the explanation. He ultimately didn't find intentional disregard for the truth because he said he thought it was a communications failure. We disagree, but not to be diverted from the point, we went through that whole process and no one ever mentioned LSP. Now, Louisiana State Police, when Judge Drell reviewed the reporting recommendation, as is the district court's right to do, it can look at the full record, and he said, well, wait, Agent Bode said I was relying on an earlier determination by the state police. But there's no such earlier determination in the record anywhere, and it would seem like that would have been the front and center at the magistrate judge hearing if there was a ready explanation. That would have been. That would have been, here, we've got it. Somebody said it was an explosion beforehand. Nobody did. Nobody did. Nobody did. Counsel, doesn't it come down to, you referred to this several times, it comes down to whether really ultimately Judge Drell was clearly erroneous by saying, based on all of what's in this record, including Bode, and you've corrected my pronunciation, thank you, Bode's affidavit, that he was neither intensely misstating the fact of the termination or recklessly stating that there had been determination. Implicit in that, it seems to me, is that Judge Drell, who is the operative decision maker, was deciding that Bode got ahead of himself, thinking from what he knew, this was an explosion, rushing to get the affidavit done, and without being reckless but being careless, not closing the loop but calling the scene, he made this representation. It seems to me that is one way to look at it, and you say that you quibble. It sounds like I'm dismissing it. You argue about the standard review for us. But it does seem to me this is a fact-finding on what was in Bode's head when he did this, and was he intentionally misstating? Was he reckless and not double-checking, or was he just going too fast and stating what he thought for sure was the situation? And we acknowledge that clearly erroneous standard applies. We acknowledge that that's a tough standard. Some cases meet it, and we think this one does because the reference to the Louisiana State Police investigation is so counterintuitive to the record. It sort of meets your definition that something can be clearly wrong if you look at everything, totality of circumstances, and come away with a firm conviction that an error was made. If you think you've answered Judge Southwick's question fully, and I'd like to move on to the whether or not the affidavit would nonetheless be good enough on the pineapple explosive devices and all from the unknown witness, and whether it would survive anyway. That is the second level of inquiry. We have an unknown individual who said that he had seen the defendant at a building next to his residence several months ago with pineapple grenades, and then he also said he had seen him with pipe bombs. He said, without giving any kind of time reference, that he's got machine guns. We don't know anything else. Our argument is that that statement, while warnings are- Threat to his estranged wife? Yes. And the vehicle, which you use the word vandalized, and the vandalized vehicle belonged to the estranged wife? It did. All right. Then that information was in there. That information was in there as well. All right. And the magistrate judge said that he thought that was bare bones, and normally would not be enough, but because he considered the other factors, he thought was sufficient. What's the best bare bones case? Pardon me? The best bare bones case for you. The best? The best case to say that it's bare bones and shouldn't be considered. Is that if you were looking at it without the explosives pointed at it, none of it would get you a warrant? Right. I'm sorry. I'm asking actually for the name of the case that you think is most analogous that we should rely on to find that this was a bare bones affidavit in other respects. On that issue, I don't have a specific. Okay. Thank you. May I yield the balance of my time for a moment? Thank you. Oh, I do have another question. If you were assuming arguendo that you were to prevail, would the result be that we would remand, not say that it should be suppressed, but remand for further proceedings like in the Namor case? Is that what would happen if you were to prevail, assuming arguendo? I think you would reverse and remand. I don't know what further proceedings there could be. Okay. Thank you. May it please the Court. Counsel. My name is Mignon Griffin, and I represent the United States Attorney's Office for the Western District of Louisiana. I would like to start at the end with the bare bones argument. I think that with all due respect to the magistrate judge, I believe he was misinterpreting the bare bones case law. As I read it, it is talking about conclusionary statements by the agent, not just limited factual assertions. I don't know how much more facts could be put on that bone. Mr. Womack called his sister-in-law and said, if your sister comes home, she is going to be blown up. I don't see how that's bare bones. I mean, did he want to know the color of the telephone? I don't mean to be sarcastic, but did he need to know the color of the telephone that he called? I mean, I don't know how that could be. That's not a conclusionary statement. That is a fact. That is reporting what Mr. Womack said to threaten his wife. I thought the issue was whether or not these – who is the person that saw these explosive devices? When was it that they saw these explosive devices? I think that's the part that he's saying is bare bones, not the statement to the sister-in-law. Actually, the magistrate judge said that the statement about the sister-in-law's statement or the statement to the sister-in-law, excuse me, was bare bones. Okay, but can you talk about the other part? Yes, ma'am. First of all, I would point out that that argument was not made below by the defendant. He did not say that the informant, for lack of a better word, was lacking in credibility or did not provide enough detailed information. And perhaps that's because we learned at the detention hearing that it was the defendant's own brother who was the concerned individual, and it would make sense that for the sake of family harmony, you wouldn't want to be attacking your brother's lack of credibility. But what the magistrate did, though, is that they had spoken to someone who had enough interaction with the defendant that over a period of time he had seen the defendant in possession of hand grenades, pipe bombs, and currently knew that the defendant possessed not just machine guns but two specific types of machine guns. He also was able to provide the agents with the defendant's address and tell them about the saddle house, this outbuilding. He was able to describe that with some specificity, and the agents were able to go to the address that the informant had provided and confirm that, in fact, there was this saddle house. So they were able to corroborate the information that he provided, and I submit that along with the detailed type of information that Mr. Womack's brother provided established probable cause for the issuance of this warrant, whether or not there was the information about the explosion at the SUV. What does the law say about staleness, like saying several months ago the person had this? If it was drugs, it would definitely be stale. And you agree with that, right? Yes, ma'am, absolutely. If it was the drugs, it would absolutely be stale. I did not find a lot of Fifth Circuit case law on point dealing with weapons. There is a lot of case law from other circuits, which I cited in a quite lengthy footnote. Sorry, it's a very lengthy footnote in my brief. But as the magistrate judge found, Your Honors, I believe that machine guns, hand grenades, pipe bombs, those are the kind of things that someone would possess for a long period of time. And you had a recent threat of domestic violence. I mean, he was threatening his estranged wife. The night before, yes, Your Honor. You had a recent threat of domestic violence, and you had a very recent incident that appeared at least it was inconclusive, but the appearance was that it could have been an explosion, right? Everyone was operating on the assumption. And his threat was, is I'm going to blow her up. Yes, sir. All right. Yes, sir. And everyone was operating. To turn to the first issue, if Your Honors are done with your questions on the second one, to turn back to the first issue, I just the court found that exigency was a real issue in this case. And I just want to explain to you all the sequence of events to show that it was. Ms. Womack left her mother's home around 8 o'clock in the morning and went out and found her car with the rear window blown out. The glass is shattered inside and outside the car. The frame is twisted. And there are what the magistrate judge described as an exploded bunny in the car. The pictures are in the record. There are basically bunny guts everywhere. The little ears are laying on the floor. It's just gross. Anyway, but you can see the smear all throughout the car, and the windows are black and making it appear that some type of explosion occurred in the car. And she called the Catahoula Parish Sheriff's Office. The deputies responded. They, I believe, said that they did not know what they had on their hands, so they called the state police.  And thus they activated a memorandum of understanding that they have with the FBI and the ATF that they only activate when there is an explosion. And so they called Special Agent Bland with the FBI. Counsel, the statement you're making now gets back to some points my colleagues have made. To the extent, Judge, that Bodie's explanation at the suppression hearing is at all plausible, you're at the point now where his statement is, that state police, parish sheriff, determined, what that really means is made a preliminary belief that this was sufficiently evidence of an explosion to call in the ATF. You think that fits? Do you think what he said in the suppression hearing, Bodie, fits with what you're just telling us, or is this sort of something we almost ignore, what his testimony was? Because it doesn't seem very plausible to me. Well, you know, he wasn't on the scene. He was the one left behind. But he said it was his understanding in his testimony that agents were rolling to Catahoula Parish to work an explosion. Well, but he said that why I said it was later determined, and later must mean later after the first discovery of the event perhaps by the estranged wife. I'm not sure later to what. But it was later determined to be an explosion, and I meant that Louisiana State Police had determined. So does that fit with what you're telling us? It does, Your Honor, because the state police's determination led to the activation of the memorandum of understanding and the calling out of the FBI and the ATF. So what is the Louisiana State Police determination later to? I assume the Catahoula Parish Sheriff's Office arriving on scene. Well, that's what you've got to come up with, I guess. It's consistent with the agent's testimony, Your Honor. All right. So the ATF is notified about 9.39 that morning, according to Special Agent Mann. They arrived on scene at 11.45, which I almost don't see how that's humanly possible because I lived the first 17 years of my life in Jonesville, and it's three hours from Shreveport. But they took this very, very seriously, and they got there very quickly. And yet they were not able to immediately start processing the vehicle because the record shows that there was a nearby building that was a business that Mrs. Womack and her sister owned, and the state police were afraid that because of what had happened to the vehicle that there were explosives in that building, and they had to wait while the state police used their robot to go into that building and ensure that it was safe so that no secondary device would go off and harm the agents that were on site working the vehicle. So everyone was operating on the assumption that this had been an explosion, and meanwhile Special Agent Bodie is back in Shreveport, and he started working on his affidavit, and he was getting a number of text messages from Agent Pius and also found out about the additional information that had come from the defendant's brother. So they were operating, especially in light of the threat to Mrs. Womack, they took this very seriously, they were working very quickly, and I submit they did the best job they could under the circumstances. What stands out? I'm sorry. Go ahead. How is it the best job they could? I don't think you have to go to best job they could to win the case. And how is it possibly the best job they could when he doesn't contact the person at the scene and he could easily do that during the time in between? Well, I don't think it's quite as. . . He was speaking to his supervisor. He testified that he was speaking with Resident Agent in Charge Raspberry, who was speaking with the people on scene. I don't know why he didn't personally call, perhaps. He was told to, wasn't he? They said, why don't you check with them, maybe they know something, I thought. Did he not suggest that he contact someone? I don't think he said that. I think what Agent Pius said is, I'm not there on the scene. Well, that would say, well, I better talk to somebody on the scene. He's waiting for information. He thinks he doesn't have enough information. He's saying, I need more for probable cause. And he says, I'm the person. . . So he said, why doesn't he say, I want to call the scene? As I said, he was speaking with the RAC, Agent Raspberry. So I don't know, Your Honor. Perhaps Agent Raspberry told him to let everything come through me so that they're actually doing their job. Is that in the record? It's not in the record, Your Honor. But I would like to point out that I need more PC. Based on the bomb that exploded is what he texted. He wasn't saying, I don't think I have enough PC to get a warrant. And, of course, his subjective belief is really irrelevant anyway. But he was saying, I need more PC based on the bomb that exploded. Are there detonators? Are there caps? Is there black powder? He wanted more details to put about this specific bomb. He always believed that there had been an explosion. And he always believed that that, in part of his affidavit, was correct. Why didn't the person say, hold up. We don't know that there's been a bomb exploded yet. Agent Pice did not testify at the hearings, either hearing. I don't know that, Your Honor. Anyway, this is a case where exigency was a major factor. As the magistrate judge found and as Your Honors have recognized, this was made to appear to be a bombing. When you say exigency was a major factor, what does exigency excuse in this case? What's your point when you say that? That the facts, as we know today, were not necessarily the facts that Agent Bode believed at the time. Because this was a fast evolving, fast moving investigation. And the agent was doing the best. The faster it is, the more okay it is to rush to judgment. I'm just trying to understand how exigency helps you. Because this court has recognized that when considering whether or not the agent acted deliberately or recklessly, exigency is a factor that needs to be considered. So if he had to act fast, he can be more reckless? Connect the dots for me. I think what the case law is saying that exigency, not that you can be reckless. This is the determination of whether it's recklessly or knowingly. But exigency, I was talking to an attorney in my office about this last week. You think you know something when you're conducting an investigation, and two days later you realize you knew nothing because you find out another piece of information that changes everything. And Agent Bode was making an affidavit based on what he knew at the time at 4 o'clock that afternoon, less than eight hours, about eight hours after the incident had occurred. And that's different than what we knew two weeks later or four weeks later or whenever the hearing on the motion to suppress. I guess my point is you don't judge what the agent stated then. You don't critique any errors in the affidavit based on things that we learned later. You have to recognize that it is a fast-moving investigation, and he's doing what he can to accurately represent to the court what the state of affairs is at that moment. Why did the magistrate judge back on the second? What do we know? The second point, why the magistrate judge said that statement about the wife, the estranged wife, that he said he was going to blow her up. Why would that be bare bones? I don't believe it. That doesn't, I don't, it's got a direct person. We know who said it. We know who they said it to. We know what they said. We know when they said it. I'm trying to figure out what's bare bones about that part. I see nothing that's bare bones about it, Your Honor. That's why I said with all due respect to the magistrate, I just don't see that that's bare bones. Let me ask you the same question I asked the other side. Assuming, Arguendo, that you were not to prevail on your interpretation of the affidavit, would we remand based upon the Namer case for further proceedings for them to look at other bases about whether the evidence should be suppressed and all of that, or would we, what's the result in this case? I mean, I have to concede, Your Honor, that I don't know what else the government could put forward. We would just reverse and render? Yes, ma'am. I think so. I don't know what else the government . . . And I'm not foreshadowing. I'm just making sure we have all the information we need as we're going through the case. Yes, ma'am. I assume that you all would just suppress the evidence and we would, and the defendant would go free. I had not been able to come up with any other thing that would salvage this case if that happened. So, I did just want to make one point. Mr. Womack in his brief and just now in his argument claims that the government is arguing for the first time on appeal that Agent Bode was referring to the state police findings. That is actually not accurate. The government did make that representation at the hearing on the motion to suppress, and Agent Bode so testified at the hearing. But, as I said, that's irrelevant because the agent's objective . . . I'm sorry. It's irrelevant because the ruling can be sustained on any basis supported by the record. So, whether we argued it below or not is really not . . . The MOU and the evidence . . . It is not, Your Honor, but Agent Mann, I believe, who was a defense witness, testified to it. Perhaps Agent Bode did also. And, I would also point out that, according to Agent Mann, even as the time of the hearing on the motion to suppress, there had been no determination. He believed that an explosion had occurred. He just did not know how it had occurred. So, we still do not know to this day exactly what happened or how that explosion occurred, but he did believe there had been an explosion. He speculated that perhaps a device he called a potato gun, which I believe is . . . Well, I don't know what a potato gun is. I eat potatoes. Okay. I think it's some kind of aerosol propellant, perhaps, that could have propelled the rabbit through the window and into the car. He still believed that an explosion had occurred. Anyway, if the Court has no further questions, I cede back the balance of my time. Thank you, Your Honor. Thank you. Appreciate your argument. I don't think it's an illegal weapon, but it doesn't matter. It shouldn't be used. Before I forget, the magistrate judge said that the reference to the speculation about a potato gun was nothing more than that. There's nothing in the record that supports that. Agent Mann didn't communicate any opinions to Agent Bodie, the agent who was actually getting the warrant and saying that the ATF had made a determination. So his opinion at the hearing on the motion to suppress wouldn't have been a factor anyway and it would have been subjective rather than the objective test that, in their brief, they otherwise insist that we use, and rightly so. But in my limited time, I'd like to address two issues that I don't think I got to the first time, at least not in any detail. First, exigency. That was not found by the magistrate judge, but it was found by the district judge. There are certain things where exigent circumstances and being rushed can cause a person to make a mistake, leave out a word, mistype an address, similar omissions. If it's raining out, being in a hurry won't make you say the sun is shining. There's nothing about what was happening that day in the several hours that the agent took to write the search warrant affidavit that was so rushed it should have caused the agent to say, I know that there has been a determination. There was what was later determined to be an explosive event. That, I would agree, is a result of not adhering to the facts, but it's not the result of being rushed. Exigency is a factor that is considered, but in this particular case, it just doesn't make any sense. In Namer, granted, the court said there were no exigent circumstances, but the reason we cited Namer and think it's important, just like the Averez case, is that you have overstatements and affidavits about classifications that it's very likely a reasonable magistrate judge would rely on. And the ATF is the most respected and has the most expertise on explosives as any law enforcement agency in the United States. And to start this whole process off, and it is in Paragraph 3, Judge of the Affidavit, you asked me about that, to essentially start this process off by saying the ATF, or imply that the ATF has made that determination, sets everything off on the wrong course. Why did the magistrate say that the wife's sister's alleged statement about the day that she goes in the house of Dora blew up was bare bones? Here we ought to give the magistrate judge the same deference that they're asking you to give on all other issues. He heard all the testimony. He saw the demeanor of the witnesses and was able to assess how much significance that the agents gave at that time. And he said, you know, I don't really think that that was something heavily pushing this, at least not by itself, maybe in connection with other evidence. Similarly, we are not changing our argument about the individual who gave information. They say we're suddenly attacking his credibility when we did not before, and that the individual is the defendant's brother. Well, first of all, that's not in the affidavit, that it's the defendant's brother, so it's irrelevant. But we argued below that the problem was with his information, it's not a reliability of confidential informant-type argument like you see in drug cases. We were saying he doesn't say it precisely. We are how did he come into this information? How does he know he has machine guns? We were saying below that the ---- He didn't say he saw them? He did. At the house? Not the guns. Oh, yeah, he does. That's a separate sentence. He sees the pineapple-style hand grenades at the house. Several months before at the house, he said. My time is up. Thank you, Your Honor. Thank you. Thank you, counsel. We appreciate both of your arguments today. Thank you.